IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| MARK GILBERT RIMBERT, individually §<br>and as Personal Representative of the Estates §<br>of GILBERT JOHN RIMBERT, and §<br>OLIVIA ACOSTA RIMBERT, deceased, §<br>Plaintiff, §<br>§<br>vs. §<br>§<br>ELI LILLY AND COMPANY, §<br>Defendant. § | CASE #1:06-cv-00874-JH/LFG |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
LILLY'S MOTION FOR RECONSIDERATION**

Having lost three dispositive motions, and then lucked into a situation which enabled it to remove Judge Browning from further involvement in this case, Lilly has the unbelievable chutzpah[1] to ask this Court to exercise its discretionary authority to reconsider each and every one of Judge Browning's rulings. It wants this Court to reread 169 pages in briefing and 1,517 pages of exhibits contained in its motions (including the 18-page post-argument brief which Judge Browning graciously allowed Lilly to file with regard to the learned intermediary issue, Doc. 100), and, of necessity, the 67 pages in briefing and 780 pages of exhibits which were filed in response. Presumably, it also wants this Court to rehear the hours of oral argument that Judge Browning accorded to Lilly to present its motions. And, perforce, it wants this Court to ignore the 157 pages of scholarly opinions that Judge Browning wrote to explain his denial of two of Lilly's three motions and start over at square one. Why?

---

[1] The word is a wonderfully expressive Yiddish expression which describes the insolence of someone who has over-stepped the boundaries of accepted behavior with no shame whatsoever. The classic example is of the boy who, after being convicted of the murder of his parents, begs the court for mercy because he is an orphan. *See* Kozinski, *Lawsuit Schmawsuit,* 103 Yale L.J. 463 (1993).

Lilly claims that this Court must bear these burdens to safeguard "due process, the interests of justice, and the need for public confidence in the integrity of the judicial process." Lilly Memorandum at 1. To be sure, exercise of this Court's discretionary powers *is* appropriate to safeguard both the actual integrity, as well as the appearance of integrity, in the judicial process. But the needed protection is from threats to its integrity by Eli Lilly, *not* Judge Browning. Because the undisputed facts, and, critically, the *timing* of those facts, reflect that Lilly clearly waived any claim to recusal or disqualification until <u>after</u> Judge Browning denied its three motions, and further because the subsequent disclosure of October 8th pertained to an event that happened <u>after</u> the judge had ruled, the Court should deny Lilly's motion for reconsideration and hold that Lilly is judicially estopped from asking for reconsideration of these rulings. With regard to the alternative relief sought, *i.e.,* discretionary certification for interlocutory appeal with respect to two of the rulings, the Court should for the reasons explained below, deny same.

### The Facts

Timing is everything. Here is what the full record shows.

- April 23, 2008: During course of a status conference, Judge Browning advises parties that he had previously owned stock in Pfizer, another manufacturer of SSRI drugs.

- May 12, 2008: Judge Browning sends a *sua sponte* letter to counsel making a very courageous and detailed disclosure of private financial and personal circumstances. Exhibit A. Significantly, he write, "[i]f anyone, however, has *any questions* about the above, please let Ms. Sanchez know, and we can perhaps have a conference." *Id.* Alternatively, if either party was uncomfortable with his continued involvement, he did not relegate them to the recusal/disqualification process under 28 U.S.C. § 455. Rather, his letter says that all either party has to do to remove him from the case is make a phone call to the clerk (who is under instructions not to tell the judge who called). *Id.*

- May 13-15, 2008: Lilly does not avail itself of either avenue to either investigate or disqualify the judge. Lilly *wants* Judge Browning on the case.

- May 16, 2008: Judge Browning conducts multi-hour hearing to give Lilly's counsel ample time to orally argue two of the three dispositive motions. In an off the record, but in court, conversation with counsel, he apprises all parties of an additional matter bearing upon his continued involvement in the case. A federal probation officer had noticed that the case was on Judge Browning's docket, and was a friend of the Rimbert family. He merely mentioned that fact to the judge. Judge Browning stopped him immediately, and disclosed this to counsel for both sides. Again, to Lilly, this was no big deal. Lilly wanted Judge Browning to decide its motions.

- May 16, 2008: Plaintiff implores Judge Browning to certify the learned intermediary issues in the case to the one court that has the authority to make a decisive and authoritative determination of New Mexico law, *i.e.,* the New Mexico Supreme Court. Official transcript, beginning page 36. Lilly objects and urges Judge Browning to make the decision himself. *Id*. at 70-72.

- At this same hearing, Lilly does a flip-flop on preemption. In a prior telephone conference with the Court, Lilly had said that it would proceed to trial without a ruling on its preemption based summary judgment. Mr. See advises the Court that he had consulted with his client, and now wanted to insist on a ruling from Judge Browning before proceeding to trial. The Court, again, agreed with Mr. See's request. *Id*. at 80-84.

- August 18, 2008: Even though Lilly had filed a brief and a reply brief, and had argued its summary judgment motion for hours, it sought leave of Court to file yet another brief. Judge Browning granted Lilly's request. Doc. 108.

- August 22, 2008: Judge Browning issues a 106 page, scholarly opinion, denying Lilly's MSJ on state law issues, including the learned intermediary doctrine. Doc. 112.

- September 26, 2008: Telephonic hearing on Lilly's preemption motion. Judge Browning promises Lilly that he will rule on their preemption motion before trial, and indicates to counsel that he will probably do so via a short minute order, to be augmented at a later time with a more formal opinion.

- September 29, 2008: Judge Browning issues a 51-page opinion denying Lilly's *Daubert* motion. Doc. 125.

- October 2, 2008: Judge Browning denies Lilly's preemption motion in a short order which promises a more formal written opinion in the future. Doc. 129.

- On or about October 3, 2008 (approximately four days after September 29th): An incident involving a member of Judge Browning's family occurs. *See* Doc. 133 for explanation.

- October 8, 2008: Judge Browning sends second disclosure letter to counsel, advising them of the event which clearly had happened after his preemption ruling. Doc. 133. As with the first letter, he gives counsel two avenues to pursue the matter. The first is a conference with the Court. Obviously, at this conference, Lilly could have asked Judge Browning himself to vacate his prior interlocutory orders and step down. The second is the same offer he made on May 12th, *i.e.,* in essence, "If you want me off the case, just call the clerk and it will be done. No questions asked. He won't even tell me who called." As Lilly's motion papers reflect, it took the second path.

- November 6, 2008: Lilly files a motion seeking complete reconsideration of Judge Browning's three rulings. It claims that this is necessary to preserve the appearance of propriety and the integrity of the judicial system.

## The Law

**I.   THE COURT SHOULD NOT RECONSIDER LILLY'S THREE MOTIONS.**

Lilly really did not need extensive citations to establish the fact that a district judge always has plenary power and jurisdiction to reconsider interlocutory orders. That is beyond dispute, although it is usually done only when the prior ruling was "clearly erroneous" or "would work manifest injustice." *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983).

Indeed, one case illustrates the point quite well. When Lilly first filed its preemption based motion for summary judgment, the centerpiece of its argument was Chief Judge David Hamilton's September 19, 2007 opinion in *Tucker v. SmithKline Beecham, Corp.,* 2007 WL 2726259 (S.D.Ind. 2007). But on July 18, 2008, the judge granted the plaintiff's motion for reconsideration and reversed himself. *Tucker v. SmithKline Beecham Corp.*, 2008 WL 2788505 (S.D. Ind. 2008). He

did it in the interests of justice. He did it because he was wrong to find preemption in the first place. The judge wrote that "[i]n finding conflict preemption, the court failed to appreciate the significance of the fact that the FDA regulations allow a manufacturer to modify pharmaceutical labels unilaterally and immediately, without prior FDA approval, when the manufacturer has reasonable evidence of a serious hazard." *Id*. at *1.

  Nor is there any dispute about the fact that a court *may* choose to reconsider rulings which were made by a disqualified judge. The question is not whether the Court *can* do so, but rather whether it *should*. The lead case is *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), and it establishes a framework for analysis of both disqualification and recusal and the remedy to be imposed for them. There, the High Court found a clear violation of 28 U.S.C. § 455(a). But, in spite of the violation, it wrote, "[a] conclusion that a statutory violation occurred does not, however, end our inquiry. . . . There need not be a draconian remedy for every violation of § 455(a)." *Id*. at 862. On review of the specific facts before it, however, the Supreme Court agreed with the Court of Appeals, finding that the trial judge's failure to disclose and failure to recuse when asked, were inexcusable. It wrote: "The violation is neither insubstantial nor excusable. . . . It is therefore appropriate to vacate the judgment *unless* it can be said that respondent *did not make a timely request for relief*." *Id*. at 867-68 (emphasis added).

In *Liljeberg*, as in the other cases Lilly cites,[2] vacation was warranted only because the trial judge did something wrong. There is no hint of any wrongdoing by Judge Browning in this case. But there is a very strong whiff of waiver.

**A.     Judge Browning Has Done Nothing Wrong.** Judge Browning, whom Lilly refuses to name in its pleadings,[3] did a really courageous thing. First on May 12th; and then again on October 8th, he subjugated his own family's privacy to the interests of complete integrity and transparency in the administration of justice in this District. His conduct stands in stark contrast to the conduct of the district judge in *Liljeberg, supra*: "it is remarkable – and quite inexcusable – that Judge Collins *failed* to recuse himself on March 24, 1982. . . . Another two-day evidentiary hearing would surely have been less burdensome and less embarrassing than the protracted proceedings that resulted from Judge Collins *nonrecusal* and *nondisclosure*." 486 U.S. at 866 (emphasis added).

---

[2]  Lilly cites four Tenth Circuit cases. All of them involved situations like *Liljeberg* and unlike the case at bar, where the trial judge either (a) failed to disclose, (b) refused to recuse, or (c) exhibited demonstrable public prejudice against a party. *Clark v. City of Draper*, 1997 WL 157382 (10th Cir. 1997)(unpublished)(judge represented in personal matter by same law firm); *United States v. Franco-Guillen*, 2006 WL 2879063 (10th Cir. 2006)(Government agrees that trial judge's slurs about defendant's heritage and propensity for lying warrants vacation of judgment); *United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993)(Judge's appearance on *Nightline* to discuss abortion issues necessitated disqualification; *Bell v. Chandler*, 569 F.2d 556 (10th Cir. 1978)(Amazing case involving disbarments, a § 144 affidavit, and a request for Writ of Prohibition by the Attorney General of the United States).

Lilly ignored the unpublished opinion in *United States v. Green*, 1992 WL 102542 (10th Cir. 1992) where the Tenth Circuit held that not every disqualification impinges on constitutional rights or warrants post-judgment relief.

[3] Lilly's insistence on referring to the Judge in its motion papers as "the previously-assigned judge," is outright silly. Everyone knows that this case was assigned to Judge Jim Browning and Lilly cannot take the sting out of its accusations against him by the repeated use of this vacuous phrase.

But, instead of complimenting the Judge for his unprecedented candor, Lilly bided its time, waited for favorable rulings, and then, when it did not receive favorable rulings and the case was set for trial, and the opportunity presented itself, it removed the Judge from the case. As noted above, this distinguishes the case at bar from each and every case cited by Lilly in support of the reconsideration of rulings made by a subsequently disqualified judge.

The Court must, indeed, protect both the actual integrity of its processes, as well as the appearance of same. So, what message will the Court send to the Bar? Will it condone, and thereby encourage, other litigants to stand mute in the face of potentially disqualifying disclosures, to play out their hands in the hopes of a win, and then to get a second bite at the apple via a subsequent disqualification and reconsideration? Fortunately, the Court need not write on a tabula rasa. There is precedent to guide the pathway.

**B.     Lilly Has Waived Earlier Disqualification, and, Thereby Reconsideration.** Just as it is axiomatic that a trial court retains plenary jurisdiction over interlocutory orders, so, too, is it undisputed that a party can *waive* judicial disqualifications under the "appearance of impropriety" standard of 28 U.S.C. § 455(a). 28 U.S.C. § 455(e). *Liteky v. United States*, 510 U.S. 540, 566 (1994)(Kennedy, J., concurring).[4] In *Welch v. Sirmons*, 451 F.3d 675, 701 (10th Cir. 2006), the Tenth Circuit wrote that "'a full disclosure' by the trial judge of the possible bases for disqualification can 'completely remove' any basis for questioning the judge's impartiality," and found that the

---

[4] As the *Liteky* court held, mandatory disqualifications under § 455(b) may generally not be waived. *See, e.g., Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2nd Cir. 2003). However, even with a disqualifying financial interest, divestiture can preclude disqualification. 28 U.S.C. § 455(f). Moreover, the majority of the courts construing the issue have also found that, even under § 455(b), the motion to disqualify must be made in a *timely* way. *See Summers v. Singletary*, 119 F.3d 917 (11th Cir. 1997).

disclosure by the state trial court judge that one of the investigating detectives and key witnesses in the case *was his son* and the defense counsel's failure to object to his continued participation constituted a waiver.

In a number of cases, some reported and some not, courts have found that silence or acquiescence in the face of disclosure constitutes a waiver of disqualification. *E.g., Moran v. Clarke*, 296 F.3d 638, 650 (8th Cir. 2002)(declining to remand to a different district judge in spite of close personal relationship between judge and one of the parties); *Mangum v. Hargett*, 67 F.3d 80, 82 (5th Cir. 1995)(issue waived if not raised until appeal); *Martinez v. Tarrant*, 59 Fed.App. 998 (9th Cir. 2003)(unreported).

A party like Lilly, who is aware of circumstances which, in its judgment, might disqualify the judge, and which takes no action to do so, waives the issue. In *Summers v. Singletary*, 119 F.3d 917 (11th Cir. 1997), the court held that the requirement for a timely objection even extended to mandatory disqualifications under § 455(b). It wrote: "The policy considerations supporting a timeliness requirement are the same in each section; to conserve judicial resources and prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge." *Id*. at 921.

Lilly's motion in this case runs headlong into these policy considerations. It asks the Court to expend, rather than conserve judicial resources. And it does so, in spite of full disclosure, only after it had waited for, and received, not one, but three "adverse decisions." Its conduct should not be countenanced. Rather, the Court should hold that Lilly waived any disqualification prior to October 8, 2008.

Waiver and estoppel are parallel doctrines. In addition to waiver, the Court may also find that the circumstances presented here justify judicial estoppel. Just as recusal/disqualification exists to protect both the integrity and appearance of same from damage as a result of the conduct of the Court, the doctrine of judicial estoppel exists to provide the same protection from the conduct of litigants (or their counsel, who obviously have dual roles, *i.e.,* not only as advocates for their clients, but also as Officers of the Court.[5]). *New Hampshire v. Maine*, 532 U.S. 742, 753-54 (2001).

Although the Tenth Circuit had been historically loathe to employ the doctrine, in *Johnson v. Lindon City Corp.*, 405 F.3d 1065 (10th Cir. 2005) it followed the Supreme Court's lead in *New Hampshire* and held that it would apply if a party (a) took a prior inconsistent position, (b) persuaded the court to accept that position, and (c) would obtain an unfair advantage or impose an unfair detriment on its adversary by switching courses in midstream. Clearly these elements are satisfied in the case at bar. With full knowledge of Judge Browning's May 12th disclosures, Lilly took the firm position that it wanted him to decide the case. He was persuaded to do so, even to the point of refusing the plaintiff's request to certify the learned intermediary issue to the New Mexico Supreme Court. And, vacation of the three dispositive rulings would clearly be to Lilly's advantage, and to Mark Rimberts's profound disadvantage.

Numerous judges have written that the judicial estoppel doctrine is designed to keep a litigant from "blowing hot and cold in one breath." In May of 2008, when Judge Browning made his initial disclosures, Lilly chose to represent to him that it wanted him to remain on the case. In October,

---

[5] From the lengthy history of the Prozac litigation, it is clear that it is Jim Burns of Eli Lilly that drives the bus on corporate strategy. As discussed below, it was Lilly who previously attacked another courageous trial judge, the Honorable John Potter from Kentucky, who refused to allow his court to be used as a pawn in Lilly's strategy to "vindicate Prozac" at all costs.

-9-

after the judge disclosed a *subsequent* event, Lilly chose to remove him from the case. A charitable view of that action would be that, with the trial scheduled in the near future[6] and the specter of numerous discretionary evidentiary rulings looming on the horizon, Lilly thought that it would be better for another judge to pick up the torch and carry it over the finish line. But the motion filed on November 6th precludes such charity. Lilly removed the Judge from the case because he had ruled against them on their three dispositive motions. The proof is in the pudding. And the Motion for Reconsideration demonstrates it.

The Court should neither countenance such behavior by Lilly, nor encourage same from other litigants. Rather, it should hold that Lilly waived any claim for disqualification prior to October 8th, and that it is judicially estopped to seek reconsideration on that basis by another judge of this Court.

**II.   THE COURT SHOULD NOT CERTIFY ANY ORDER FOR INTERLOCUTORY APPEAL.**

As with the Motion for Reconsideration, the alternative Motion for Certification is addressed to the Court's sound discretion. The statute conferring appellate jurisdiction depends on the presence of three prerequisites: (1) a "controlling question of law" (2) as to which "there is substantial ground for difference of opinion," and (3) a determination that "an immediate appeal . . . may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Lilly correctly notes that these standards were discussed by Judge Browning himself in *Certain Underwriters at Lloyd's,*

---

[6] Nothing that Judge Browning did with regard to the handling of the three motions in issue even hints of partiality towards the Plaintiff. Additionally, he postponed the trial from its October setting at Lilly's specific request. When the Plaintiff complained about a delay until March 2009, the Judge did accommodate us with an alternative setting in December for a period of time that had cleared up because he granted summary judgment against some other plaintiff in some other case. From a "perspective of justice" standpoint, there is certainly nothing wrong with a *trial* judge setting a case for a prompt *trial*!

*London v. Nance*, 2006 WL 4109675 (D.N.M. August 24, 2006). In that case, he declined to certify the order in question for interlocutory appeal. This Court should do the same with regard to the two[7] orders in issue.

      **A.**     **The *Daubert* Ruling.** Clearly, gatekeeping rulings under Rule 702 are highly fact dependent, within the meaning of this Court's opinion in *Certain Underwriters at Lloyds London v. Nance*, 2006 WL 4109675 (D.N.M. August 24, 2006). More importantly, they are decidedly *discretionary* decisions which are reviewed on appeal for abuse of discretion. In light of this standard of review, the Tenth Circuit itself has written that "*Daubert's* effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on essentially the same science may reach different results." *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1204, 1206 (10th Cir. 2002). With this standard of review, it is unlikely that an interlocutory appeal would advance the ball in any material respect.

      The Supreme Court has been very critical of the use of § 1292(b) to secure appellate review of discretionary decisions. Several have involved class action determinations, where much is at stake. *See, e.g., Coopers & Lybrand v. Live say*, 437 U.S. 463, 477n.30 (1978)(dismissing appeal relating to class action certification)[8].

---

    [7] Lilly does not seek an interlocutory appeal with regard to the learned intermediary ruling. Having opposed certification to the New Mexico Supreme Court, which has the constitutional prerogative to develop the common law of this state, it would be very hard pressed indeed to argue for a certification to the Tenth Circuit which must make the same *Erie* guess that Judge Browning, a New Mexico lawyer/judge, made.

    [8] The Tenth Circuit had previously dismissed a § 1292(b) appeal of a class action determination because the appellant failed to meet the 10 day filing requirement. *Heller stein v. Mr. Steak, Inc.*, 531 F.2d 470 (10th Cir. 1976).

Lilly cites no case in which the avenue of a § 1292 certification has been used to secure appellate review of a *Daubert* gatekeeping decision. An exhaustive "ALLFEDS" search shows only three cases on point. In *Mapinfo Corp. v. Spatial Re-Engineering Consultants*, 2007 WL 28411 (N.D.N.Y. 2007) the court declined to certify a *Daubert* ruling for interlocutory appeal. In *Travelers Property & Cas. Corp. v. General Electric Co.*, 150 F.Supp.2d 360, 368-69 (D.Conn. 2001), the court did indicate a willingness to certify its denial of a *Daubert* motion for interlocutory appeal, but did so because the case involved a bellwether trial of 23 separate dryer fires. There is no history to the case, so we do not know what happened *vis-à-vis* the permitted appeal. Similarly, in *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497 (D.Kan. 1995), the district court certified a *Daubert* ruling for interlocutory appeal. Again, however, there is no further appellate history.

Moreover, there is no reason to expect that an appeal would result in expedited resolution of this case. As noted in our Memorandum to Lilly's *Daubert* motion, Lilly has been litigating the issue of Prozac-induced suicidality for more than a decade and has fought and lost *Daubert* motions in each of its cases. Even before 2004, when the FDA made a causality determination *vis-à-vis* suicidality in youthful patients and mandated both BLACK BOX warnings and Patient Medication Guides about this risk, courts were finding the causal link to be "generally accepted" within the meaning of *Daubert*. *E.g., Cassidy v. Eli Lilly,* filed as an exhibit to Plaintiff's *Daubert* response. The actions by the FDA only further reinforce this general acceptance. *See Hollander supra* at FN 20.

---

In *In re Delta Airlines*, 310 F.3d 953 (6th Cir. 2002) the district court refused to certify its *Daubert* ruling for interlocutory appeal, but did certify its class action determination. The Court of Appeals declined to exercise its appellate jurisdiction.

**B.     The Preemption Ruling.** Unlike the discretionary issue with regard to *Daubert*, the preemption issue is an issue of law as to which the scope of review on appeal would be *de novo*. It can, under appropriate circumstances, be appropriate for certification under § 1292(b). *E.g., Fry v. Airline Pilots Ass'n., Intern.*, 88 F.3d 831 (10th Cir. 1996)(interlocutory appeal of preemption issue). We also acknowledge that, as long as *Levine* is pending in the Supreme Court, there must be "substantial ground for difference of opinion" with regard to that issue. However, an interlocutory appeal is not warranted because Lilly has failed to establish the third prong under § 1292(b), *i.e.,* that an interlocutory appeal would "materially advance the ultimate termination of the litigation."

As noted above, on July 18, 2008, Lilly lost the main precedent on which it relied for its preemption claim, when Chief Judge Hamilton granted the plaintiff's motion for reconsideration and reversed himself in *Tucker v. SmithKline Beecham Corp.*, 2008 WL 2788505 (S.D. Ind. 2008). He did so because the statute in question, *i.e.,* the FDCA, contains a clear expression of congressional intent *not* to preempt state tort law claims and because the controlling FDA regulation, 21 CFR § 314.70, empowers drug manufacturers to "add or strengthen warnings" on their labels without FDA approval. But, to be sure, there are some cases cited by Lilly in which the district courts have ruled the other way. These cases all involve other SSRI drugs and claims of violence or suicidality as side effects. But none involve Prozac itself, with its unique factual and regulatory background. In the end, these fact may be distinguishing from any other precedents.

We also acknowledge that the Supreme Court's opinion in *Levine v. Wyeth* may be instructive. But that fact alone does not militate in favor of the rest of the judicial system simply standing still and waiting for a ruling that may or may not control. From the certification standpoint, the question is whether an interlocutory appeal would materially advance the ultimate outcome of

this litigation. It is true that the Tenth Circuit has two cases, *i.e., Dobbs* and *Miller* which involve similar claims but different drug makers. Plaintiff's lead counsel in this case is also lead counsel for the Dobbs and Miller families. But the Tenth Circuit has received no briefs and heard no arguments. Rather, it has put those cases on hold pending *Levine*.

Lilly could have asked Judge Browning to put its motion in this case on hold pending *Levine*. But it did not do so. Rather, at the May 16th hearing, and again via letter to the Judge, Doc. 105, it asked for a prompt ruling on the motion by Judge Browning himself. The Judge obliged, albeit not with the ruling that Lilly wanted.

Lilly's motion has been decided and there is no reason to circumvent the normal processes of appellate review and to seek an interlocutory appeal. Lilly previously told Judge Browning that it would proceed to trial if it lost its dispositive motions. Plaintiff feels the same way. This case is trial ready.

If the Supreme Court decides the *Levine* case before a Final Judgment is entered in this case, then the Court can certainly decide for itself[9] whether something in that ruling warrants a revisiting of the preemption motion. If it does not, then the issue can always sort out in the normal appellate process. In any event, because an interlocutory appeal to a court that already has two similar cases on hold pending *Levine* will not "materially advance" the ultimate disposition of this case, within the meaning for § 1292(b), therefore, the Court should not certify that ruling either.

---

[9] With no disrespect for the Tenth Circuit whatsoever, we would like to point out that this Article III judge is every bit as capable of reading and applying the teachings of *Levine* as the Article III judges on that court.

**III.  BURNED ONCE – BURNS AGAIN.**

Eli Lilly is asking this Court to do an extraordinary thing.  It is asking that the Court discard hours and hours of diligent work by a fellow judge and start all over from square one.  Moreover, it has the unmitigated gall to suggest that this is necessary to preserve the "appearance of integrity" in the judicial process.  Because Lilly's motion appeals to the discretion of the Court, it is appropriate to review the history of Lilly's actions *vis-à-vis* the judiciary with regard to the issue of Prozac and suicidality.  It is a history of utter disdain.  The Kentucky Supreme Court branded Lilly's conduct thusly: "[i]n this case, there was a serious lack of candor with the trial court and there may have been deception, bad faith conduct, abuse of the judicial process or perhaps even fraud."  *Potter v. Eli Lilly & Co.,* 926 S.W.2d 449, 454 (Ky. 1996).[10]

From start to present, Lilly's Prozac litigation strategy has been orchestrated by an in-house lawyer named Jim Burns.  It was Mr. Burns who negotiated the secret settlements in the Kentucky *Fentress* case.  And it was Mr. Burns who attended the court-ordered mediation in this case, and who, undoubtedly, has insisted that Messrs. Outler and See file the instant motion.

*Fentress* was the first Prozac violence case to go to trial in this country.  Prozac was still under patent, and, as Lilly's top executives candidly wrote in an early email, "if we lose Prozac, Lilly will go down the tubes."  Exhibit B (February 7, 1990 email at 8:58).  Judge John Potter was a good draw for Lilly.  He was a very conservative Kentucky state trial court judge.  The trial, in the Fall of 1994, lasted for many weeks.  The plaintiffs tried and tried to introduce evidence about the fact that

---

[10]  In addition to the *Potter* and *Winkler* opinions cited herein, the entire sordid affair is chronicled in several other secondary sources, including Varchaver, *"Lilly's Phantom Verdict"* (American Lawyer, 1995); and Cornwell, THE POWER TO HARM (Viking Press, Penguin Books, 1996), chapters 37-40.  Copies can be provided to the Court if necessary.

Lilly had been criminally convicted of failing to report, or misreporting, the deaths of elderly people taking its drug Oraflex.  Judge Potter repeatedly kept the evidence out.  But when a Lilly witness touted the company's reputation for reporting adverse events to the FDA, Judge Potter reversed his ruling and found that they had opened the door.  The parties then jointly asked the judge for a one day recess.  When they came back, the plaintiff's lawyer told the judge that he would save this critical evidence for the punitive damages phase.  Judge Potter then inquired as to whether they had reached a settlement.  The lawyers lied to him!

The trial resulted in a 9:3 verdict for Lilly and a resulting judgment in Lilly's favor, "dismissed pursuant to jury verdict."  As Judge Potter's subsequent affidavit stated, and as the Seventh Circuit subsequently wrote, before its misconduct was unearthed by Judge Potter, "Eli Lilly made the verdict the centerpiece of a national publicity campaign, touting the safety of Prozac." *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1199 (7th Cir. 1996).  When word got around to Judge Potter that, in fact, the case had settled, he issued a show cause order.  Not wanting his court's judgment to be misused, he simply asked the parties to show cause why the judgment should not be amended to read "dismissed pursuant to settlement."

Lilly went apoplectic.  Joining forces with the plaintiff's counsel in the case, Lilly sought a Writ of Prohibition on the technical ground that the time for amending the judgment had expired. The Kentucky Court of Appeals bought it, but, as noted above,  the Supreme Court reversed.  It held that a court always has inherent power or jurisdiction to prevent a fraud upon the court, and that Lilly's conduct, at minimum, reflected a "serious lack of candor with the court" and, "perhaps even fraud."  *Potter v. Eli Lilly*, *supra.*

In a subsequent case in Oklahoma, Mr. Burns was actually called to testify about the *Fentress* settlement. Transcripts of his testimony, first before the court *ex parte*, and then subject to cross-examination in open court, are attached as Exhibit C.[11] At one point in the second hearing, Judge Burrage asked:

> "How long have you been a lawyer, Mr. Burns? ... Did it bother you at all that you have what I presume are hundreds of thousands or millions of people that are on Prozac or taking this drug and that a deal had been cut with the MDL counsel whereby, number one, evidence was not submitted at the trial and, number two, the fact that he had presumably been paid, I'm going to say millions of dollars, and you can tell me if I'm wrong, and if he breathed a word of any of that, the rest of his money would be cut off and you have all of these other plaintiffs out here that are relying on him? Did it bother you that Lilly was a party to that kind of an agreement?"

*This* is the company who insists on asking this Court to trash Judge Browning's scholarly opinions. The aphorism is *à propos*: *Once burned – twice shy*.

## Conclusion

For all of the foregoing reasons, Lilly's motion should be denied.

//
//
//
//
//
//
//
//
//

---

[11] These transcripts were, at Lilly's request, originally marked as confidential. However, when Lilly violated the court's confidentiality order by sending them at warp speed to plaintiff's counsel from the *Fentress* case (who was about to be interviewed by an Assistant Attorney General of Kentucky), Judge Burrage declassified them as a discovery sanction against Lilly. (Note: It was Mr. See who discovered his own client's violation of the court's order and who promptly brought the matter to the court's attention.).

Respectfully submitted,

VICKERY, WALDNER & MALLIA, LLP

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
One Riverway Drive, Suite 1150
Houston, TX  77056-1920
Telephone:  713-526-1100
Facsimile: 713-523-5939
Email: andy@justiceseekers.com

S. Rafe Foreman
FOREMAN, LEWIS & HUTCHISON
New Mexico Bar No. 4161
611 S. Main Street, Suite 700
Grapevine, TX  76051
Telephone:  817-336-5533
Facsimile:  817-336-9005

Certificate of Service

I certify that on this 1st day of August, 2008, Agreed Motion to Set Preemption Briefing Deadlines has been electronically filed with the Clerk using the CM/ECF system, which will automatically send email notifications of such filing to the following attorneys of record:

Andrew See, Esq.
Katherine M. Hihath, Esq.
SHOOK, HARDY & BACON, LLP
2555 Grand Blvd.
Kansas City, MO  64108

Thomas A. Outler, Esq.
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
P.O. Box 1888
Albuquerque, NM  87103-1888

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery